UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

BRIAN TREMATORE PLUMBING

& HEATING, INC.,                         Civil Action No.:

                      Plaintiff,

         -vs-                                **JURY TRIAL DEMANDED**

                                         **ECF Case**

WALSH CONSTRUCTION GROUP, LLC

and CONSIGLI CONSTRUCTION CO., INC.

a/k/a WALSH/CONSIGLI JV,

                      Defendants.

------------------------------------------------------------x

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

The Plaintiff, Brian Trematore Heating & Plumbing, Inc., (hereinafter referred to as "Plaintiff"), by its attorneys, Mackey Butts & Wise, LLP, as and for their Complaint herein against the Defendants, Walsh Construction Group, LLC and Consigli Construction Co., Inc. a/k/a Walsh/Consigli JV (hereinafter, collectively referred to as "Defendants"), allege the following:

## INTRODUCTION

1. Plaintiff brings this action to recover losses incurred in connection with certain construction services more fully set forth below provided by Plaintiff to Defendants, who are construction managers for the Vassar Brothers Medical Center Expansion Project (hereinafter the "Project").

2. The gravamen of Plaintiff's Complaint sounds in breach of contract, however, as more fully set forth below, the level of bad faith and wrongdoing on the part of Defendants is to such a degree that the specter of fraud by Defendants cannot be ignored.

## JURISDICTION AND VENUE

3. This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. §1332(a)(1), because the parties are domiciled in different states and the total amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## PARTIES

4. Plaintiff, Brian Trematore Plumbing & Heating, Inc. is a New Jersey corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Fairfield, New Jersey. Plaintiff is a plumbing and heating contractor.

5. Defendant, Walsh Construction Group, LLC is an Illinois limited liability company organized and existing under the laws of the State of Illinois and upon information and belief is authorized to do business in the State of New York.

6. Defendant, Consigli Construction Co., Inc., is a Massachusetts corporation organized and existing under the laws of the State of Massachusetts and upon information and belief is authorized to do business in the State of New York.

7. Upon information and belief, Defendants formed a joint venture, Walsh/Consigli JV, for the purposes of the Project.

## STATEMENT OF FACTS

8. On January 13, 2017, Plaintiff contracted with Defendants for provision of plumbing installation at the Project (hereinafter "Subcontract").

9. Plaintiff served as a subcontractor to Defendants, who are the construction managers on the Project. The prime contract was signed by Defendants on or about September 13, 2016 (hereinafter "Prime Contract"). At the time Prime Contract was executed, the owner of the Project, was Health Quest Systems, Inc. (hereinafter "Health Quest"). Upon information and belief, Health Quest and Western Connecticut Health Network merged in or about April 2019 and became known as "Nuvance Health Inc." (hereinafter "the Owner").

10. On or about January 2016, the Owner presented the Project to the City of Poughkeepsie Planning Board, which at that time was described as "the largest construction project ever in the city at $466 million." [1]

11. The Project was initially designed and presented to all involved, including Plaintiff, as a seven-story building consisting primarily of patient rooms totaling 696,000 square feet.

12. Subsequently, on or about February 7, 2018, the Owner announced that the building plan was being revised from a seven-floor structure to an eight floor-structure, which significantly increased the square footage of the Project.

13. The total agreed upon contract price was $17,895,000.00. This agreed upon contract price did not include any amounts related to change work orders.

---

[1] Daily Freeman, January 28, 2016.

{00162968 1}

14. At the time the Subcontract was entered into, the design was for seven floors and therefore the addition of the eighth floor increased the scope of work, as per change order numbers 10, 11, 12, 13 and 14.

15. The Subcontract states that Plaintiff will also be bound by the terms and conditions of the Prime Contract. There are twenty-one (21) references in the Subcontract to the Prime Contract.

16. Prior to executing the Subcontract, Plaintiff requested a copy of the Prime Contract from Defendants.

17. Defendants refused to provide a copy of the Prime Contract to Plaintiff.

18. The Subcontract called for Plaintiff to follow a design provided by Health Quest to Defendants and in turn, to Plaintiff.

19. Defendants also did not provide the building information modeling (hereinafter "BIM") to Plaintiff until after the Subcontract was signed.

20. The Project design under the Subcontract was to be a certain level of development known in the construction industry as "LOD300". LOD300 is a three-dimensional design. Notably, the two-dimensional design utilized by Plaintiff for purposes of bidding on the Project was derived from the three-dimensional design.

21. From the very outset of work on the Project, it became apparent to Plaintiff and other subcontractors that the level of development for the design provided by the Owner and the Defendants was not as promised in the Subcontract.

22. The design for the Project was provided to the Owner by CallisonRTKL (hereinafter "CRTKL"), which is an architectural firm based in Baltimore, Maryland.

23. At no time during the Plaintiff's work, despite numerous requests from Plaintiff, was CRTKL involved in either communications or troubleshooting surrounding the design.

24. The original "Substantial Completion Date of Impatient Tower" as set forth in the Subcontract was August 19, 2019. However, upon information and belief, this date has been altered by Defendants to sometime in February 2020.

25. To date, Plaintiff has yet to receive an updated critical path method (hereinafter "CPM") schedule related to the Project's extended timeline.

26. As more fully set forth below, Plaintiff's progress on the Project was negatively impacted due to a multitude of problems which under no uncertain circumstances was caused by Plaintiff.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT
## (DEFECTIVE DESIGN)

27. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

28. The Project design was not to the level of development (hereinafter, "LOD300") as defined by AIA E202 and prescribed by the Subcontract. Moreover, the Owner and/or Defendants owed a buildable design to each and every subcontractor on the Project in order for each and every subcontractor, including Plaintiff, to properly proceed with work.

29. Plaintiff engaged an independent expert in BIM software to assess the feasibility of constructing the design based on the actual level of development in the BIM provided by Defendants.

30. The independent expert determined that the Project design provided was not at a sufficient level of development to construct the systems as shown in the BIM provided. Specifically, the BIM provided, omitted numerous design elements, including but not limited to,

primary equipment and owner supplied items (i.e., a pneumatic tube communication system and datacom system), and also had incomplete piping and systems, with numerous conflicts between different types of work (i.e., plumbing and electrical) incumbent in the design.

31. Water pipes and medical gas piping on Level 1 of the Project and the entire Impatient Tower did not fit in the space allotted for them. Accordingly, a change order was initiated, for this problem and to date drawings to resolve the conflict have not been received.

32. A second example of defective design is one involving patient room toilet installation. The total number of toilets, required in the Impatient Tower, as prescribed by the design was two hundred and eighty-four (284).

33. Upon attempting to install the toilets, according to the design provided, Plaintiff learned that the sanitary pipe outlet at the base of each toilet was directly above the structural steel framing, which supported the deck. Accordingly, the design layout of the toilets had not been properly coordinated with the design of the structural steel, which affected work in the Impatient Tower and the first floor of the Project.

34. Plaintiff properly followed the Subcontract by promptly informing Defendants of this defective condition.

35. Defendants chose to ignore Plaintiff's notice of this defective condition.

36. Additional work was required on the part of Plaintiff to complete the toilet installation. However, Plaintiff never received such a change order in order to perform the work.

37. Another example of defective design includes installation of a copper-silver ionization system to prevent legionella and other similar biological hazards. A change order was initiated by Plaintiff as it relates to this problem and to date it has not been signed by Defendants.

38. The original design provided by Defendants did not include such an ionization system.

39. This component of the Project was simply excluded from the original design.

40. These, and many more design defects, omissions and mis-managements were the subject of change orders properly submitted by Plaintiff to Defendants.

41. For instance, water was not on site at the Project until sometime after August 9, 2019, which caused significant delays to Plaintiff's work.

42. Each of these change orders can thus be traced back to the incomplete and incorrect design provided by the Owner.

43. Upon information and belief, there have been a total of 109 change orders by Plaintiff on the Project.

44. Many of the change orders are more than a year old without being approved by Defendants.

45. The defective design, in conjunction with unanswered and unresolved change orders, had a rippling effect on work sequencing, scheduling and coordination; constantly interfering with Plaintiff's day-to-day work.

46. Furthermore, due to poor design and coordination, Plaintiff has been required to improvise certain work at greater cost and delay in order to achieve completion.

47. For example, Defendants requested that Plaintiff rework certain canopy storm drains, which are located off a garage entrance so that the underground lines are routed back to the building in order to accommodate roofing insulation.

48. Plaintiff informed Defendants that due to the fact there are yard storm drainage inlets for purposes of draining the driveway, it is likely easier to route the canopy drains to the storm drainage line.

49. If Plaintiff's suggested route had been chosen, it would have avoided navigating footings and grade beams, which are required to support the canopy.

50. Defendants also required Plaintiff to install, relocate and reinstall numerous pipe hangers on several floors on three separate occasions, whereas the design called for only one installation.

51. The triple reinstallation of pipe hangers resulted in a change order in the amount of one hundred thirty-three thousand, two-hundred ten dollars and 00/100 ($133,210.00). This was also not approved by Defendants who improperly denied the change order.

52. Numerous relocations were required because the original design did not properly locate various heating ventilation and air-conditioning (hereinafter "HVAC") systems and electrical components in the space above the ceiling. Upon the proper space requirements being ascertained, Defendants directed Plaintiff to relocate its piping.

53. Also, as a consequence of the Project's lack of potable water on site, Plaintiff was required to perform smoke testing instead of water testing on the plumbing system, which was at the additional expense of Plaintiff.

54. Plaintiff also demonstrated to Defendants that installation of headwalls and gas service outlet boxes and panels in patient rooms was prevented due to interference from other mechanical, electrical and carpentry work.

55. Defendants refused to recognize this interference and instead improperly penalized Plaintiff.

56.     These interferences include not only the toilet piping and steel structures but also: framing installation conflicting with piping; installation of insulation and dry wall prior to the installation of electrical piping and work; and reinstallation of the cast and fire stop devices, which were damaged as a result of prematurely pouring concrete.

57.     The defective design on the Project constitutes a breach of the Subcontract between Plaintiff and Defendants in that Defendants have failed and refused to pay Plaintiff in full for labor, services and other materials furnished in the execution of the work provided for the Prime Contract and pursuant to the Subcontract.

58.     Plaintiff has suffered damages in the amount of $5,469,126.07, plus interest, attorney's fees and costs, as a direct and proximate result of Defendants' breach of contract.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT
## (IMPROPER BACK CHARGES AND CUTS)

59.     Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

60.     Plaintiff has suffered damages as a result of Defendants' extensive and improper back charging, which are the direct consequence of negligent project planning, design and management on the part of Defendants.

61.     The design issues, defects, deficiencies and coordination interferences set forth in this Complaint were repeatedly articulated by Plaintiff to Defendants.

62.     Indeed, upon information and belief, there are three hundred and ninety (390) requests for information (hereinafter "RFIs") on this Project issued by Plaintiff to Defendants.

63.     Of the three hundred and ninety (390) RFIs submitted by Plaintiff to Defendants, six (6) remain completely unanswered and forty-three (43) were flagged with response that was not accepted.

64. Notwithstanding the lack of response to these RFIs, Defendants impermissibly and excessively back charged Plaintiff for a total amount of $13,278,432.00.

65. For example, an invoice submitted by Plaintiff for various hardware including shower diverters, which are a line item on the Subcontract, was improperly cut by Defendants.

66. Defendants' reason for cutting the requisition was their assertion that the shower diverters should be considered part of a larger water system, despite the fact that shower diverters are not fixtures, and therefore no such funds should be dispersed against the labor related to the line item for such shower diverters.

67. Another example is Defendants have also improperly back charged Plaintiff's for fireproofing.

68. As a result of Defendants' failure to respond to RFIs in a timely fashion, Plaintiff's work was not performed in the proper sequence with respect to other work (i.e., mechanical, electrical, etc.) and has resulted in Defendants incorrectly issuing back charges to Plaintiff for associated re-work costs, which is solely due to Defendants incorrectly planned construction sequencing and failure to timely respond to RFIs. Consequently, preventing Plaintiff from completing certain work.

69. Subsequently, Defendants served Notice to Cure letters upon Plaintiff.

70. In each Notice to Cure letter, Defendants allege that Plaintiff "materially breached" the Subcontract by failing to perform work as required.

71. Notably, each of these examples of so-called Failure to Perform was not the result of Plaintiff, but instead directly attributable to Defendants' improper management of the Project.

72. Indeed, it is was impossible for Plaintiff to have cured most, if not all, of the tasks described in the Notice to Cure letters, due to interference and the assertion by Defendants that the cures must occur within 72 hours, is therefore without merit.

73. Accordingly, Defendants have breached the Subcontract with Plaintiff by improperly back charging Plaintiff and failing to follow Subcontract provisions surrounding payment.

### THIRD CAUSE OF ACTION
### QUANTUM MERUIT

74. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

75. Plaintiff provided valuable labor, services and materials, which were necessary for Defendants to perform and complete its obligations under the Prime Contract.

76. Defendants benefitted from Plaintiff's labor, services and materials, including but not limited to, the fact that Defendants could not have fully performed and completed its obligations under the Prime Contract in the absence of the labor, services and materials that Plaintiff provided. Plaintiff also went to Chicago to meet with Defendants, in good faith, in order to amicably discuss and ultimately settle the various issues with regard to the Project at that time. Plaintiff left that meeting under the impression that things would improve, when they in fact did not and have not improved such that this action had to be initiated.

77. Defendants have failed and refused to pay Plaintiff for the labor, services and materials that Plaintiff provided.

78. Plaintiff has suffered damages and Defendants have been unjustly enriched as a result of Defendants' failure to pay Plaintiff for the labor, services and materials provided by Plaintiff.

## FOURTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

79. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

80. Defendants' statements with regard to the Project's design, sequencing, scheduling and coordination were to be used by Plaintiff for the purpose of performing the work agreed to under the Subcontract.

81. Defendants made such statements to Plaintiff, who by virtue of the Subcontract has contractual horizontal privity with Defendants.

82. Plaintiff relied on the statements made by Defendants in order to complete the work contracted for under the Subcontract.

83. When Plaintiff began to question the truth of Defendants' statements with regard to the Project's design, sequencing, scheduling and coordination, Defendants continued to assert that Plaintiff had the correct information with which to proceed the agreed upon work.

84. Defendants understood that Plaintiff was relying upon their statements with regard to the Project's design, sequencing, scheduling and coordination.

85. Plaintiff has suffered damages as a result of Defendants' negligent misrepresentation with regard to the Project's design, sequencing, scheduling and coordination.

## FIFTH CAUSE OF ACTION
## TRUST FUND DIVERSION

86. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

87. Defendants entered into the Subcontract with Plaintiff, whereby for consideration to be paid to Plaintiff by Defendants, Plaintiff agreed to furnish to Defendants all labor, materials, equipment, insurance, taxes and supervision as required to fully fabricate and deliver F.O.B. and install all plumbing on the Project site.

88. The agreed price and reasonable value of the labor and materials to be furnished and delivered by Plaintiff to Defendants was the sum of $17,895,000.00, less any and all change order amounts.

89. Of the agreed price and reasonable value of the goods and materials furnished by Plaintiff to Defendants with respect to the Project, there remains due and owing from Defendants to Plaintiff the sum of $5,469,126.07, no part of which has been paid although duly demanded.

90. The goods and materials furnished by Plaintiff to Defendants were actually furnished for the construction of the Project.

91. Plaintiff has performed all conditions required under said Subcontract to be performed by it and is not in default of the Subcontract.

92. Defendants have failed and refused to pay Plaintiff the outstanding amount due.

93. Upon information and belief, Defendants have received payments from the Owner of the Project on account of the Prime Contract for the Project of amounts in excess of the monies owed by Defendants to Plaintiff.

94. The funds received by Defendants on the Project constitute trust funds pursuant to Article 3-A of the Lien Law of the State of New York for the benefit of and to be applied to the payment of Plaintiff, who has furnished labor and materials in connection with the work at the Project.

95. Defendants had knowledge of the existence of Plaintiff's claim for monies due from Defendants.

96. Upon information and belief, Defendants have diverted some of said trust funds for non-trust purposes either to themselves or to others rather than for the payment of Plaintiff, who has furnished labor and materials in connection with the wok at the Project.

97. By reason of the foregoing, Plaintiff has been damaged by Defendants in the sum of $5,469,126.07 plus interest, no part of which has been paid although duly demanded.

98. This action is brought by Plaintiff pursuant to Article 3-A of the Lien Law of the State of New York on behalf of itself individually, and on behalf of all other persons or entities, who are trust fund claimants by reason of labor and materials furnished to Defendants on the Project and who have not been paid in full.

99. Plaintiff seeks a determination and allocation of the respective interests of Plaintiff and other persons or entities, if any, in and to the trust funds in the hands of Defendants, or as Defendants may be liable for.

100. The Lien Law of the State of New York provides that any trustee of an Article 3-A trust, and any officer, director or agent of such trustee, who either applies or consents to the application of trust funds actually received by him for any purposes other than the trust purpose of that trust is guilty of larceny and is punishable as provided in the penal law.

101. Because of the egregious conduct of the Defendants in diverting trust monies in blatant violation of the Lien Law of the State of New York, accompanied by malice or reckless or willful disregard of Plaintiff's rights, Plaintiff is entitled to recover attorneys' fees and exemplary and punitive damages against Defendants.

102. The actions of Defendants as alleged above constitute and/or are a part of a deceptive and wrongful scheme and pattern affecting the public welfare and legal rights.

103. One year has not elapsed since Plaintiff has performed work on the Project, the improvement upon which Plaintiff's claim arose.

104. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

With regard to the First, Second, Third and Fourth Causes of Action: (1) damages in an amount to be proven at trial; (2) costs of suit incurred herein; and (3) reasonable attorneys' fees; and

With regard to the Fifth Cause of Action: (1) that Defendants be required to account for the New York State Lien Law Article 3-A trust funds, which have been and are received with respect to the Project, for at least the sum of $5,469,126.07, plus all additional amounts necessary to pay all of the respective claims of all claimants and Plaintiff; (2) that Defendants be declared a trustee of such sums; (3) that Plaintiff and all other claimants similarly situated, be adjudged to have claims against said trust funds for the amount of their respective claims; (4) that Defendants be compelled to disclose all transactions between them with reference to the Project, including a statement of all monies either held or paid on account thereof, and to whom paid and the dates of such payments; (5) that Defendants be compelled to discover, disclose, account for and pay over all sums of money either held or received by each on account of the Project, and account for the disposition of any such sums of money disposed of, and also all property and assets of every kind and nature into which the said sums of either money or any part thereof are traceable; (6) that Plaintiff be granted judgment against Defendants in the amount of $5,469,126.07; (7) that all other claimants similarly situated each be granted judgment against Defendants in the amount of their respective claims; (8) that Plaintiff recover of Defendants, jointly and severally, reasonable and adequate attorneys' fees and disbursements; (9) that Plaintiff recover of Defendants, jointly and severally, exemplary and punitive damages in the amount of $16,407,378.21, or such other amount as may either be requested at trial or granted by the Court; and

With regard to all causes of action, that Plaintiff recover interest on all sums recovered, together with such other and further relief as this Court may deem just and proper.

Dated: October 22, 2019
      Poughkeepsie, New York

                          Mackey Butts & Wise, LLP

                          By: _____
                          David R. Wise (DW 3016)
                          *Attorneys for Plaintiff*
                          319 Mill Street
                          Poughkeepsie, New York 12601
                          P: 845-452-4000
                          F: 845-454-4966
                          E: dwise@mbwise.com